UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| FBK PARTNERS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 09-292-GFVT |
| v. ) | |
| ) | |
| HUBERT THOMAS, et al., ) | |
| ) | **MEMORANDUM OPINION AND** |
| Defendants. ) | **ORDER** |
| ) | |
| ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on FBK Partners, Inc.'s ("FBK") Motion for Partial Summary Judgment Against Defendants Hubert Thomas ("Thomas") and Peerless Medical Tubing, Inc. ("Peerless"). [R. 81.] FBK seeks summary judgment on its breach of contract claim against Thomas and its intentional interference with a contractual relationship claim against Peerless. [Id.] All parties have filed the appropriate Responses and Replies and, thus, the matter is ripe for review. For the reasons set forth below, partial summary judgment will be granted in favor of FBK since the contract has been breached.[1]

---

[1] Thomas also moves for summary judgment on the breach of contract claim against him [R. 69]. Accordingly, his motion will be denied. Thomas's motion exclusively discusses the breach of contract claim against him, but in the final paragraph he asks for "all claims of the Plaintiff against [him]" to be dismissed. [*Id.*] According to the Second Amended Complaint [R. 49], there are several additional claims pending against Thomas. FBK has not moved for summary judgment on those claims, and because Thomas provides no support for a grant of summary judgment in his favor on those claims, his motion for summary judgment [R. 69] will be denied in its entirety. The moving party bears the initial burden of identifying both the basis for its motions and the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). If Thomas intended to move for

1

**I.**

FBK is a Delaware corporation that manufactures, markets, and sells precision thermoplastic disposable medical products globally. [R. 49, 55.] Its principal place of business is Pembroke, Florida. [*Id*.] FBK was originally founded in 1981, but the current owners purchased the company in 2007. [R. 81.] Thomas worked for FBK as its Director of Manufacturing and as a sales representative. [R. 49, 55.] As such, Thomas was familiar with the chemical and mechanical processes and tooling requirements necessary to manufacture FBK's products. [*Id*.] As a sales representative, he was also privy to FBK's cost and pricing data, as well as information about its customers. [*Id*.] This Court is not aware of the exact date that Thomas first began working for FBK,[2] but it is undisputed that after the current FBK owners acquired the company, Thomas signed an Employment Agreement that contained a non-compete provision. [R. 49-1, 69.]

The Employment Agreement took effect on February 1, 2007 and was to extend through January 31, 2009. [*Id*.] It was to automatically renew for up to two additional one-year terms unless either party provided written notice of his intent not to renew. [*Id*.] Paragraph 8 of the Employment Agreement contains the non-compete. In subparagraph (b), Thomas acknowledged

---

summary judgment on the remaining claims against him, he has failed to meet this burden. *See also* Fed. R. Civ. Pro. 56(e)(2). Similarly, Naramore, Murray, and Peerless's motion for summary judgment on the intentional interference with a contractual relationship (between FBK and Thomas) claim will be denied. [R. 80.] Naramore, Peerless, and Murray have also moved for summary judgment on the following claims against them: 1) violation of trade secrets, 2) breach of fiduciary duty, 3) conversion, 4) breach of contract, 5) intentional interference with the contractual relationship between FBK and Naramore, 6) intentional interference with the contractual relationship between FBK and MMS, and 7) unjust enrichment. [R. 80.] An order on these remaining motions will follow shortly.

[2] His Motion for Summary Judgment [R. 69] states "a number of years."

that, while working for FBK, he would become privy to confidential information, including information about clients and accounts, the techniques and technology used by FBK, and FBK's financial information. By signing the agreement, Thomas agreed not to disclose (or assist in disclosure) any of FBK's confidential information. Subparagraph (c) provides that during the term of his employment and for a 24 month period following termination of employment, Thomas was not to 1) "seek or accept employment with any competitor" of FBK "doing business in the United States or Mexico," or 2) "engage in any independent business enterprise which competes directly or indirectly" with FBK. In subparagraph (d) Thomas agreed not to solicit FBK's clients during his employment and for two years after leaving FBK. Finally, in subparagraph (e) Thomas agreed not to attempt to hire or take away any of FBK's employees or independent contractors. [*Id.*]

Thomas worked for FBK primarily in Alabama. [R. 69.] Approximately two years after signing the Employment Agreement in 2007, the Alabama plant closed and Thomas was required to move to Florida. [*Id.*] He was also required to spend "a significant amount of time" working in Mexico. [*Id.*] Because he was unhappy with his new working conditions, in January of 2009, Thomas sent an email to FBK, resigning. Nevertheless, according to Thomas's deposition testimony, after sending the email, the owners of FBK contacted him and negotiated his staying on with FBK by allowing him to work remotely from Alabama. [Thomas Deposition, pp. 48-50.] Thomas admits that, after the negotiations, he "intended to remain with FBK indefinitely." [*Id.*] Since his original email resignation provided an effective resignation date of March 13, 2009, Thomas alleges that March 13 was his "last day" with FBK. However, he stated otherwise

in his deposition.³  Regardless of his official last day, both parties agree that Thomas was being paid by FBK until the end of May.

Significantly, as early as August 8, 2008, Thomas sent co-defendant Tim Naramore ("Naramore") an email containing, among other things, a pricing list of FBK products, a list of materials used by FBK, and cost information. [R. 69-1.]  Naramore is a former FBK employee who resigned from FBK to establish a competitor medical tubing company, Peerless, just one month after this email was sent. [*Id*., Naramore Deposition, p. 55.]  FBK alleges that this email is evidence that Thomas was knowingly and purposefully providing FBK's confidential information to Naramore to help him establish Peerless.  [R. 81-1.]  Thomas and Naramore do not deny the existence of the email, but instead contend that they cannot recall when or how the email exchange took place.  [Thomas Depo., p. 33.]  All of the defendants adamantly deny that the materials sent actually constitute "confidential information," an argument that the Court finds unpersuasive.

Both Thomas and Naramore were FBK employees at the time the email was sent.  That Naramore was still technically working for FBK at the time the email was sent is not necessarily detrimental to FBK's assertion that Thomas breached the non-compete by disclosing confidential information.  The factual question is whether Thomas knew, at the time he sent the email, that Naramore planned to leave FBK to start Peerless.  There is evidence in the record to indicate that Thomas did at least know about Naramore's plans to leave FBK before Naramore officially resigned.  [Naramore Depo., p. 53.]  It is also clear that Naramore's intention, at the time he

---

³ "Q: So when after January 31st did you change your mind and basically decide to go through with the resignation that you tendered January 31st?  A: I guess it was the last of May."

4

tendered his resignation in September of 2008, was to start Peerless. [*Id*. at 55.] It is unclear, however, whether Thomas knew when he sent the email that Naramore was leaving FBK *with the intent to start Peerless*. What is undisputed is that Naramore left FBK just one month after receiving the email. Naramore also admits that there would have been no legitimate FBK-related purpose for Thomas to send that data to him. [*Id*. at 86-87.] Furthermore, Thomas sent the email to Naramore's personal email account, rather than to his FBK account– something which was not their typical practice. Naramore testified that it was his practice to receive any FBK-related matters via his FBK email– not his personal email. [*Id*. at 68-69.] Whether Thomas breached the non-compete by sending this email is not, however, dispositive of FBK's motion because FBK has established other ways in which Thomas breached the non-compete.

After Naramore resigned and began forming Peerless with Wallace Murray ("Murray"), Thomas, while still working for FBK, visited the new Peerless site in Monticello, Kentucky. [*Id*. at 114-15, Thomas Depo., p. 40.] Thomas argues that the visit was purely social, but Naramore admits the purpose of Thomas's visit was for him to meet Murray to determine if they could develop a working relationship. [Naramore Depo., p. 114 ("[I]f Wallace had taken an instant dislike to Hubert or Hubert had of taken an instant dislike to Wallace and Monticello, it was - the nature of that meeting was just simply a meet and greet."] While Naramore and Thomas argue that employing Thomas was not specifically discussed at the "meet and greet," Naramore admits that Thomas was not there on vacation or there to make a new friend out of Murray. [*Id*.] Significantly, at the time of Thomas's Kentucky visit, both Naramore and Murray were aware of the non-compete. [*Id*. at 115.] That Murray, at the time a complete stranger to Thomas, knew about the non-compete is compelling evidence that Thomas was there to see if he could maintain

a working relationship with Murray– a necessary step to his future employment with Peerless.

At some point in March of 2009, Thomas accepted employment with Peerless. [Thomas Depo., p. 51.] At that time, Thomas was still working for FBK. Thomas alleges that his last day with FBK was in March, pursuant to his January resignation email. [R. 69-1.] However, he does not dispute that as a result of the resignation email he sent in January, FBK negotiated his continued employment by allowing him to work from Alabama until May of 2009. Furthermore, it is undisputed that, whatever Thomas's status after the January resignation email, he was on both the payrolls of FBK and Peerless from March 2009 until May 2009. [Thomas Depo., p. 51.] Thomas accepted his last pay check from FBK in May of 2009, and continues to work for Peerless today.

## II.

### A.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the court

"must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

**B.**

The Employment Agreement contains a choice of law provision, and Thomas does not dispute that Delaware law governs.[4] Thomas's first argument is that the Non-Compete is unenforceable because FBK somehow breached the Employment Contract, thereby excusing Thomas from performing his obligations under the contract. There is some confusion in the parties' motions for summary judgment as to which of FBK's actions Thomas's allegations of breach refer. FBK seems to interpret Thomas's argument that FBK breached the contract as referring to the changes in his employment that occurred in response to his January 2009 email resignation– i.e. Thomas's working for FBK remotely so that he could move back home to Alabama. [*See* R. 86 at 18.] However, the Court believes Thomas is referring to his relocation to Florida and travel to Mexico that occurred after he signed the Employment Agreement and prior to his "first" resignation. [*See* R. 69-1 at 6.] Thomas's argument is, essentially, that he did not know he would have to relocate to Florida and travel to Mexico when he signed the Employment Agreement (and thus, the non-compete), and therefore, these changes constitute a breach by FBK, thereby excusing him from having to abide by the terms of the Employment Agreement (and thus, non-compete). This argument fails.

---

[4] In fact, Thomas cites Delaware law in his Response to FBK's Motion for Summary Judgment. [R. 85.] Kentucky treats choice of law provisions as presumptively valid unless it is clearly shown that the provision is "unfair or unreasonable." *Prezocki v. Bullock Garages, Inc.*, 938 S.W.2d 888 (Ky. 1997).

It is true that when one party materially breaches a contract, the other party may have an excuse for non-performance. Thomas, however, provides no support for his argument that a change in his duties actually constituted material breach of the Employment Agreement. Even if the modification of his duties did constitute material breach, this would not excuse Thomas from abiding by the non-compete portion of the Employment Agreement. *Centrix H.R., LLC v. On-Site Staff Management, Inc.*, 349 Fed. App'x. 769, 775 (3rd Cir. 2009). Regardless of whether he was working in Alabama, Florida, or Mexico, Thomas was still privy to FBK's confidential information, and a breach of the non-compete would still be detrimental to FBK. A modification of one part of the Employment Agreement does not nullify the rest of the agreement.[5] *See Singh v. Batta Environmental Associates, Inc.*, No. Civ. A. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) ("An oral modification to a written [non-compete] contract must be proved with evidence that is specific and direct, and that would leave no doubt of the parties' intent to change the memorialized contract terms."). Thomas should not be surprised by the Court's holding on this matter. There is evidence in the record that he knew the non-compete was valid when he began considering working for Peerless. Why else would he have provided Naramore and Murray with a copy of the non-compete? [*See* Thomas Depo., P. 61.]

Next Thomas argues that the non-compete is unenforceable because it is unreasonable. It is settled law in Delaware that, for a non-compete to be enforced, 1) the contract must be valid and entered into with mutual assent, 2) the non-compete must be reasonable in duration and

---

[5] This is not to say the Court is persuaded that Thomas's moving to Florida and working in Mexico actually constituted a modification of the Employment Agreement. The agreement provides that all modifications to the contract must be in writing [R. 81-2 at 5], and no such writing was ever produced here.

geographic scope, and 3) the non-compete must be necessary to protect legitimate interests of the employer. *KPMG Peat Marwick, LLP v. Fernandez*, 709 A.2d 1160 (Del. Ch. 1998). In this case, all three factors are met. First, the agreement is a valid contract. Regarding mutual assent, Thomas does not argue undue influence or coercion. Furthermore, the contract is supported by adequate consideration. In Delaware, employment or continued employment serves as adequate consideration for an employee's agreement not to compete. *Hough Associates, Inc. v. Hill*, No. Civ. A. 2385-N, 2007 WL 14751, at *14 (Del. Ch. January 17, 2001), *Research & Trading Corp. v. Powell*, 468 A.2d 1301 (Del. Ch. 1983).

Second, the two year duration of the non-compete is reasonable. Two year terms are generally found to be reasonable in Delaware. *See Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969), *Singh v. Batta Environmental Associates, Inc*., No. Civ. A. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003). The bulk of Thomas's argument focuses on the broad geographic scope of the non-compete. The Agreement states that Thomas is not to compete with any competitor doing business in the United States and Mexico. Thomas argues that this type of broad geographic constraint is "too broad to be enforced," yet does not cite to any cases in his Motion for Summary Judgment to support this argument. [R. 69-1.]

Neither are FBK's Delaware citations particularly helpful. FBK points this court to *Research & Trading Corp. v. Powell*, 468 A.2d 1301 (Del. Ch. 1983) as support for its argument that the geographic scope is reasonable. That case did involve a 2 year non-compete that spanned the entire United States, but the court did not discuss the geographic scope of the agreement at all. The court's determination that the non-compete was reasonable was based on a finding that the agreement was supported by consideration. The case is, however, an indication

9

that non-competes spanning the entire country (or multiple countries) are not per se invalid. *See also Victaulic Company v. Tieman*, 499 F.3d 227, 237 (3rd Cir. 2007) ("In this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated....").

Thomas accurately points out that "the determination of whether to enforce a covenant not to compete requires consideration of the factual circumstances surrounding both the contract and the parties." [R. 69-1.] Many courts look to the type of business involved (whether it operates globally, nationally, or just regionally) to determine if a broad geographic scope is reasonable. If the employer operates nationally or in some foreign countries, courts will typically find a broad non-compete reasonable. *Lantech.com v. Yarbrough*, 247 Fed. App'x. 769 (6th Cir. 2007), *Bio-Imaging Technologies, Inc. v. Marchant*, 584 F.Supp. 2d 322 (D. Mass. 2008). Other courts seem to focus more on where the employee actually conducted business, including where the customers with whom the employee had contact were located. *See Victaulic*, 499 F.3d at 238, *Pharmethod, Inc. v. Caserta*, 382 Fed. App'x. 214, 220 (3rd Cir. 2010). In the present case, Thomas worked for FBK in at least two states and in Mexico, and FBK's customers are located throughout the United States and Mexico. [R. 81 at 22.]

Instead of declaring the entirety of a non-compete invalid because of a broad geographic restriction, Delaware courts occasionally modify non-competes that impose broader restrictions than necessary. *Pharmethod*, 382 Fed. App'x. at 220, *John Roane, Inc. v. Tweed*, 89 A.2d 548 (Del. 1952), *Sidco Paper Co. v. Aaron*, 465 Pa. 586 (Pa. 1976). However, Thomas did not argue for a modification of the non-compete. Furthermore, this Court is not inclined to modify an agreement that the parties entered into with full knowledge and adequate consideration. Neither is this Court convinced that the restriction is too broad. In dealing with a company that conducts

10

business in such a broad geographic region, it would be pointless to enforce the non-compete only in a small area– especially when one considers the current technological state of the world, where businesses are no longer confined to the areas in which they are physically located.

In *Genesis Medical Imaging, Inc. v. DeMars*, No. 07-360-KSF, 2008 WL 4180263 (E.D. Ky September 5, 2008), an employee of a national MRI and CT-scan sales company signed a two year non-compete that spanned the entire United States. *Id*. at *2. The court issued a permanent injunction enforcing the agreement because it found that the geographic scope was reasonable in light of the circumstances of the case. *Id*. at *7. The company for whom the employee worked serviced customers across the United States. The employee himself worked for the company in several states, and a broad geographic scope was therefore necessary to keep the breaching employee from circumventing the non-compete. The court held, "[A] term of anything less than the entire United States would permit [the employee] to solicit prospective customers headquartered in another region, but then provide the services in [an area not covered by the non-compete] to circumvent the Non-Compete Agreement." *Id*. Because FBK operates throughout the United States and Mexico, and because a broad geographic scope is necessary to give full effect to the non-compete, the Court finds the geographic scope to be reasonable.

Finally, for a non-compete to be enforceable, it must be necessary to protect a legitimate business interest of the employer. The Third Circuit has held that trade secrets, good will, unique or extraordinary skills, and confidential information are legitimate business interests. *Zambelli Fireworks Manufacturing Co. v. Wood*, 592 F.3d 412, 422 (3rd Cir. 2010), *Pharmethod, Inc. v. Caserta*, 382 Fed. App'x. 214, 220 (3rd Cir. 2010). Client and pricing information, both of which Thomas had access to and used regularly, constitute confidential information and thus, are

11

legitimate business interests. *See Id.* Additionally, Thomas worked for FBK for many years and no doubt had good relationships with FBK's clients. Thomas was such a valuable part of FBK, in fact, that Peerless uses Thomas's name to solicit clients. [R. 81-1 Ex. F, G.] Courts have found that this type of client relationship coupled with former access to client lists and pricing is enough to constitute a protectable interest in good will. *Zambelli*, 592 F.3d at 220. Thomas clearly had access to confidential information, and FBK justifiably had him sign a non-compete in order to protect their legitimate business interests in this information and in their good will.

Of course, the enforceability of the agreement would not be an issue if there had been no breach. This Court is satisfied that Thomas breached the non-compete. The most obvious breach, and one that both parties agree occurred, is Thomas's accepting employment with Peerless while he was still bound by the non-compete. Defendants admit that Peerless is a competitor, and also admit that Thomas began working for Peerless in March of 2009. This is a clear breach of the non-compete, which prohibits Thomas from working for any competitor of FBK during, and for 24 months after the termination of, his employment.

The parties disagree about Thomas's status with FBK after March 2009. FBK contends that Thomas was still fully employed with it, even though he was working remotely. It is not entirely clear how Thomas characterizes his status with FBK in March of 2009, although his arguments may be interpreted as assertions that he was merely doing contracting work for FBK after his alleged March resignation. There is some evidence that he was receiving less money from FBK starting March 12. [R. 64, R. 90 at 2.] However, the dispute about his status between March and May of 2009 is not central to this Court's decision. There is no dispute that he was being paid by both companies during that time and keeping his Peerless employment a secret

12

from FBK. [Thomas Depo., pp. 48-51.] In short, Thomas breached the non-compete when he accepted employment with Peerless, regardless of whether he began working for Peerless while he was still a full-time employee of FBK or immediately after his effective resignation date. Either way, he was still bound by the terms of the non-compete.

Thomas likely committed breach as early as December of 2008 by traveling to Kentucky to meet with Murray and view Peerless's Monticello cite in contravention of the agreement's prohibition on "seeking employment" with a competitor. The August 2008 email Thomas sent to Naramore may also have constituted breach of the non-disclosure portion of the non-compete. However, because there is overwhelming evidence that Thomas breached the non-compete, a definitive finding on that issue is not central to the Court's ruling on this matter. In sum, on the issue of breach, the evidence, even when viewed in Thomas's favor, compels a finding that FBK prevail as a matter of law. Therefore, FBK is entitled to summary judgment on its breach of contract claim against Thomas.

## C.

In addition to its claim against Thomas, FBK also moves the Court for summary judgment against Peerless for intentional interference with the contractual relationship between FBK and Thomas. [R. 81-1.] Under Kentucky law, to prevail on a tortious interference claim, a plaintiff must prove 1) that there was a valid contract, 2) that the defendant knew about the contract, 3) that the defendant intended that the contract be breached, and caused the breach, 4) that the defendant had no justifiable reason for interfering, and 5) that damages resulted. *NCAA v. Horning*, 754 S.W.2d 855, 857 (Ky. 1988). Here, the Employment Agreement was a valid contract. Both Murray and Naramore knew about Thomas's non-compete before they offered

13

him employment. [Naramore Depo., pp. 115-117.] In fact, Murray was concerned enough about the non-compete that he gave it to an attorney to review. [Murray Depo., pp. 53-56.]

This kind of conduct falls squarely within the ambit of tortious interference. Murray and Naramore intended for Thomas to breach the non-compete, as evidenced by the fact that they offered him a job they knew he could not take without violating the terms of the agreement. That they left the decision of how to proceed up to Thomas is no defense.[6] Delaware courts have held that an employer's decision to ignore an employee's non-compete is "indicative of a tortious state of mind." *Hough Associates, Inc. v. Hill*, No. Civ. A. 2385-N, 2007 WL 148751, at *16 (Del. Ch. January 17, 2007). That court held:

> Employees, for many legitimate reasons, often desire to move elsewhere. But, when they have limited their freedom to do so by entering into a valid non-compete...and their prospective employer knows it, that employer acts at its own risk when it knowingly proceeds to sign up the employee and engage in discussions forbidden by the non-compete with the employee. By pursuing and executing such a course of action, the prospective employer knows that it is the recipient of services and assistance that the employee cannot provide without breaching contractual obligations to his prior employer.

*Id*. at *17.

Defendants do not address these specific allegations in their Response to FBK's Motion. [R. 84.] Instead, they focus on the final factor necessary for a tortious interference claim– damages. They argue that any wrongful behavior on their part is not the cause of FBK's damages and loss of customers, but rather FBK's own mismanagement. Defendants, however, have not put forth any evidence to dispute FBK's assertion that it has sustained significant

---

[6] The defendants argue that the claim must fail because Murray and Peerless did not intend to cause a breach of the non-compete. For support, they state that "after learning of the potential non-compete agreement, Thomas was told to take whatever action he deemed necessary to deal with it." [R. 80-1.]

14

damages as a direct result of Peerless's efforts to steal its clients. For example, they do not dispute the claim that seven out of ten customers to which Peerless sold products in 2009 were FBK customers. [R. 81-1 Ex. D.] Murray even admits that Peerless has pursued FBK's customers since it began operating. [Murray Depo., pp. 68-69.]

FBK states that sales to one of its major customers, BioMedix, plummeted by approximately $70,000 between 2008 and 2009. Significantly, FBK further alleges that Peerless's sales to BioMedix in 2009 grew by that same amount. [R. 81-1.] In their Response, Defendants fail to dispute this allegation or address it in any way. Instead, they continue to assert that FBK has not proven that Peerless's soliciting FBK clients, made possible in part by hiring Thomas, is the cause of FBK's recent loss of revenue. However, "conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). After reviewing the pleadings in this case, the Court finds that the defendants have not provided evidence on which the jury could reasonably find for them on the tortious interference claim. Therefore, summary judgment against Murray and Peerless is appropriate. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**D.**

Having decided to grant FBK's Motion for Partial Summary Judgment, the Court next turns to the appropriate relief.[7] The non-compete agreement in question provides for injunctive

---

[7] In its motion for summary judgment, FBK only asks for injunctive relief against Thomas and Peerless. It asks that damages arising out of Peerless's intentional interference with the FBK-Thomas contract be determined at trial. Several claims also remain against Thomas for

15

relief. Delaware law typically enforces these types of provisions in non-compete agreements because "after-the-fact attempts to quantify the damages from breaches of this kind involve costly exercises in imprecision." *Hough Associates, Inc. v. Hill*, No. Civ. A. 2385-N, 2007 WL 148751, at *3 (Del. Ch. January 17, 2007). A permanent injunction is appropriate where the moving party has demonstrated a likelihood of actual success on the merits, that irreparable harm will result if injunctive relief is not granted, and that no other adequate legal remedy is available. *City of Parma v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976).

Here, FBK has actually succeed on the merits by establishing that Thomas breached his non-compete and that Peerless tortiously interfered with the contractual relationship between it and Thomas. As for irreparable harm, the Sixth Circuit has held that loss of fair competition resulting from the breach of a non-compete often harms an employer irreparably. *Basicomputer Corp. V. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). As discussed above, FBK has shown that Peerless has been targeting its clients and has succeeded in capturing its clients' business. As a sales representative, Thomas had a personal relationship with FBK clients, and after leaving to work for FBK's new competition, Peerless has diverted business from FBK. This is enough to make out a prima facie case for irreparable harm.

How much business FBK would have maintained or gained since Thomas left is unknown, and thus damages are difficult or impossible to compute. Thus, no other adequate remedy is available. *Singh*, 2003 WL 21309115, at *9, *Basicomputer Corp.*, 973 F.2d at 512. Lastly, many courts "balance the equities" when deciding whether to issue an injunction. They

---

which FBK seeks damages. Because summary judgment was not granted in favor of either party on those claims, any damages against Thomas must also be decided at trial.

do this by weighing the harm that will result to the moving party if the injunction is not entered against the harm that will result to the party to be enjoined if the injunction is entered. *Hough Associates, Inc. v. Hill*, No. Civ. A. 2385-N, 2007 WL 148751, (Del. Ch. January 17, 2007). Based on the evidence put forth by FBK, the Court has already found that FBK will experience irreparable harm if the Court does not enter an injunction.

Thomas, however, has failed to plead any facts that would help this Court weigh the potential harm that will befall him, aside from stating the obvious– that the injunction will impair his ability to make a living. The Court is not familiar with Thomas's background or education or ability to work in fields other than medical tubing, and therefore, acknowledges the possibility of harm befalling Thomas. That Thomas committed such a brazen violation of the non-compete, however, is not lost on this Court in balancing the equities. This Court finds that it is more equitable to protect FBK's legitimate contractual expectations than speculate as to how an injunction could harm the enjoined party. *See Hough Associates*, 2007 WL 148751, at \*19 (holding that "in view of [the defendants'] conscious decision to engage in concerted behavior clearly involving a violation of the Non-Competition Agreement, the costs to [the defendants] of an injunction do not weigh heavily on the equitable scale.")

**III.**

For the reasons stated above, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. FBK's Motion for Partial Summary Judgment is **GRANTED**. [R. 81.] Hubert Thomas is hereby enjoined for a period of 24 months following the date of entry of this Order from continuing to work with Peerless, and from otherwise violating any provision of the Non-

17

Compete. Accordingly, Peerless Medical Tubing, Inc. is hereby enjoined for a period of 24 months following the date of entry of this Order from continuing to employ Hubert Thomas in any capacity.

    2.      Thomas's Motion for Summary Judgment is **DENIED**. [R. 69.]

    3.      Naramore, Murray, and Peerless's Motion for Summary Judgment is **DENIED IN PART**. [R. 80.]

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge