UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| FBK PARTNERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 09-292-GFVT |
| v. | ) | |
| | ) | |
| HUBERT THOMAS, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendants Tim Naramore ("Naramore"), Peerless

Medical Tubing ("Peerless"), and Wallace Murray's ("Murray") Motion for Summary Judgment.

[R. 80.]  Defendants seek summary judgment on all of the Plaintiff's ("FBK") claims against

them.  [*Id*.]  For the reasons set forth below, Defendants' motion for summary judgment on the

claim against Murray and Peerless for intentional interference with the FBK-Naramore contract

will be granted.  The remainder of their motion will be denied.[1]

## I.

FBK is a Delaware corporation that manufactures, markets, and sells precision

thermoplastic disposable medical products globally.  [R. 49, 55.]  Its principal place of business

is Pembroke, Florida.  [*Id*.]  FBK was originally founded in 1981, but the current owners

purchased the company in 2007.  [R. 81.]  Two of the defendants involved in this lawsuit, Hubert

---

[1] Naramore, Murray, and Peerless's motion for summary judgment on the intentional
interference with the FBK-Thomas contract was denied in a previous Order, and thus, will not be
addressed here.  [R. 117.]

Thomas ("Thomas") and Naramore, are former FBK employees. Thomas worked for FBK as its Director of Manufacturing and as a sales representative. Naramore worked for FBK between 1997 and September 15, 2008 as the assistant plant manager and lead extrusion machine operator. [R. 49, 55.] As such, Thomas and Naramore were familiar with the chemical and mechanical processes and tooling requirements necessary to manufacture FBK's products. [*Id.*] As a sales representative, Thomas was also privy to FBK's cost and pricing data, as well as information about its customers. [*Id.*]

The relationships between FBK and its employees, Thomas and Naramore began to fall apart some time after the current owners of FBK, the Kinneys, purchased the company in February 2007. Shortly after the Kinneys purchased FBK, Thomas signed an Employment Agreement that contained a non-compete provision[2]. [R. 49-1, 69.] Significantly, Naramore, an at-will employee, did not sign an Employment Agreement. Instead, he was bound only by FBK's Policies and Procedures Manual, which contained, among other things 1) a confidentiality policy that prohibited storing any information about the company outside of the company and giving purchase price or selling price information to competitors, 2) a conflict of interest policy, stating that FBK employees were not to engage in activities that would create a conflict of interests while employed with the company, and 3) a section pertaining to the use of computers and email, prohibiting use of the internet to send or receive proprietary data or confidential information pertaining to the company.

On August 8, 2008, while both Thomas and Naramore were still employed with FBK, Thomas sent Naramore an email containing a pricing list of FBK products, a list of materials

---

[2] The Court has already held that Thomas violated the non-compete and that Peerless intentionally interfered with the contractual relationship between Thomas and FBK. [R. 117.]

used by FBK and their specific gravities, and cost information.  [R. 69-1.]  FBK alleges this email is evidence that Naramore and Thomas were working together at that time to use FBK's confidential information to establish Peerless.  [R. 81-1.]  Thomas and Naramore do not deny the existence of the email, but instead contend that they cannot recall when or how the email exchange took place.  [Thomas Depo., p. 33.]  Naramore resigned from FBK in September of 2008, one month after receiving the email.  [*Id.*, Naramore Deposition, p. 55.]

After Naramore resigned and began forming Peerless with Murray, Peerless began to solicit two FBK employees, Thomas and Gary Miller of Miller Medical Specialties ("MMS").  Miller was FBK's exclusive outside sales representative.  [R. 81-1.]  He was under contract with FBK and had agreed not to compete with FBK until one year after termination of his employment.  There appears to be a factual dispute over when his non-compete expired.  FBK alleges he was bound by the non-compete until the spring or summer of 2010.  [R. 81-1 at 8.]  However, Miller believed the non-compete expired in June of 2009.  [*Id.*, Miller Depo., p. 77.]  In November of 2008, Naramore and Murray met with Miller to discuss his becoming a sales representative for Peerless.  [*Id.*]  At that time, under either view, Miller's non-compete was still operative.  [Murray Depo., pp. 78-79]  In June of 2009, Peerless hired Miller to serve as its outside sales representative.  [Murray Depo., pp. 30-32, Miller Depo., p. 63.]  He has since been soliciting clients on behalf of Peerless.

In December of 2008, three months after Naramore left FBK, Thomas visited the new Peerless site in Monticello, Kentucky.  [*Id.* at 114-15, Thomas Depo., p. 40.]  Thomas argues that the visit was purely social, but Naramore admits the purpose of Thomas's visit was for him to meet Murray to determine if they could develop a working relationship.  At some point in

March of 2009, Thomas accepted employment with Peerless. [Thomas Depo., p. 51.] At that time, Thomas was still working for FBK. [R. 69-1.] Thomas accepted his last pay check from FBK in May of 2009, and continues to work for Peerless today.

With three former FBK employees working for it, Peerless began to solicit FBK clients. Murray admits that Peerless has pursued FBK's customers since it began operating. [Murray Depo., pp. 68-69.] Seven out of ten customers to which Peerless sold products in 2009 were FBK customers. [R. 81-1 Ex. D.] As one example of how FBK has lost revenue to Peerless, FBK alleges that sales to one of its major customers, BioMedix, plummeted by approximately $70,000 between 2008 and 2009. Significantly, Peerless's sales to BioMedix in 2009 grew by that same amount. [R. 81-1.] FBK now seeks relief against Thomas, Murray, Naramore, and Peerless under a number of theories. Murray, Naramore, and Peerless have moved for summary judgment on the all of the remaining claims asserted against them. Those claims are: 1) violation of the trade secrets act, 2) breach of fiduciary duty, 3) conversion, 4) breach of contract, 5) intentional interference with the contractual relationship between FBK and Naramore, 6) intentional interference with the contractual relationship between FBK and MMS, and 7) unjust enrichment.

## II.

### A.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "A genuine dispute exists on a material fact, and thus summary judgment is

improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

**B.**

As a precursor to their substantive arguments, Defendants argue that FBK's claims against them for breach of fiduciary duty, conversion, and breach of contract are preempted by Kentucky's Uniform Trade Secrets Act ("KUTSA"), and should therefore be dismissed. They are correct that the Act is meant to replace other conflicting law that also provides a remedy for misappropriation of trade secrets. K.R.S. 365.892. The Act is not, however, meant to usurp other claims *related* to the trade secrets claims but arising out of additional or different facts. *T.D.I. International, Inc. v. Gold Preservations, Inc.*, No. 06:07-313-DCR, 2008 WL 294531, at *5 (E.D. Ky. January 31, 2008) (holding, "KUTSA does not preempt all causes of action that have to do with trade secrets, and if misappropriation is simply one element of a claim, such causes of action are not necessarily preempted.") (citing *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp.2d 784, 789 (W.D. Ky. 2001). Additionally, KUTSA does not preempt contract claims, even if those claims are based on the misappropriation of trade secrets.

*See* K.R.S. 365.892**,** *Auto Channel*, 144 F. Supp.2d at 788, *T.D.I. International*, 2008 WL

294531, at *4 (E.D. Ky. 2008). Therefore, the conversion, breach of contract, and breach of

fiduciary duty claims are not automatically preempted by KUTSA as Defendants suggest.

**1.**

Defendants move for summary judgment on FBK's claim against Naramore for violation

of the Trade Secrets Act. [R. 80-1.] To sustain a misappropriation of trade secrets claim, the

plaintiff must prove 1) that a trade secret existed, and 2) that the trade secret was

misappropriated. *Auto Channel*, 144 F. Supp.2d at 794. FBK argues that Naramore

misappropriated a trade secret by receiving the August 2008 email from Thomas. Defendants

argue that FBK cannot prove that the contents in this email actually constituted "trade secrets."

According to KUTSA, something is a trade secret if it "derives independent economic

value...from not being generally known to, and not being readily ascertainable by proper means"

and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

K.R.S. 365.880(4).

The email contains a list of materials and their costs, a list of specific gravities for

materials used by FBK in the extrusion process, and a "costing sheet," which is actually a spread

sheet used to calculate the appropriate amount to charge a customer. [*Id*.] In their motion,

Defendants argue that the information is "readily ascertainable to anyone" and thus cannot

qualify as a trade secret. [R. 81-1.] They contend that the cost information is available through

the manufacturers, and that the information on specific gravities is available on "Google." They

do not, however, provide an explanation of how the spreadsheet is "readily ascertainable," but

instead assert that the material is not valuable because it is seven years old. [*Id*.] FBK, in

contrast, asserts that the information contained in the email constitutes the "crown jewels" of the company and is not generally known or knowable by its competitors. [R. 87.]

This is clearly the kind of factual dispute that is best left to a jury. Aside from the fact that the parties cannot agree on the significance of the information in the email, there are several other issues surrounding the email that remain unresolved. For example, does the list of costs contain a list of general costs or are the costs specific to FBK? It would not be unusual for a company like FBK to receive deals from manufacturers based on a long-standing relationship or the fact that they buy in bulk. If the list of costs were specific to FBK, they would not be "readily ascertainable" to the public. Additionally, the Defendants do not explain how a spreadsheet that was created by FBK for FBK could be available to the general public. Furthermore, whether something is a trade secret is considered a question of fact. *Fastenal Company v. Crawford*, 609 F. Supp.2d 650, 671 (E.D. Ky. 2009). The evidence in this case is not so one-sided that a reasonable jury could only find that the information was not a trade secret. Whether the email constituted a trade secret presents a genuine issue of fact, and therefore, summary judgment on the trade secrets claim will be denied.[3]

**2.**

Next, the Defendants move for summary judgment on the breach of fiduciary duty claim against Naramore. The grounds for their argument are: 1) that the claim is preempted by KUTSA, and 2) and that Naramore did not owe a duty to FBK. [R. 80-1.] As for the first argument, the breach of fiduciary duty claim is only preempted by KUTSA to the extent that the

---

[3] Because the Defendants did not argue the "misappropriation" factor in their motion, the Court will not address it here

claim is based on Naramore's misappropriating trade secrets. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp.2d 784, 789 (W.D. Ky. 2001), *Greif Inc., v. MacDonald*, No. 3:06-CV-312-H, 2007 WL 679040, at *1 (W.D. Ky. 2007). Defendants are correct that FBK cannot base its fiduciary duty claim on Naramore's receipt of the August 2008 email. That claim is handled under the KUTSA. FBK has, however, pointed to additional facts to support the breach of fiduciary duty claim that are distinct from the misappropriation of trade secrets facts. FBK alleges that Naramore breached his fiduciary duty to FBK by plotting to start a competitor company and by soliciting FBK employee Bill Hamilton while still employed with FBK. [R. 87 at 4.] To the extent the claim is based on these facts, and not the 2008 email, it is not preempted.

Second, Defendants argue the claim must fail because Naramore did not owe FBK a fiduciary duty. They allege that only officers or directors owe companies the duties of loyalty and care. [R. 80-1.] They are mistaken on this point. There is no per se rule against holding mere employees liable for breach of fiduciary duties. *See ATC Distribution Group, Inc. v. Whatever it Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 715 (6th Cir. 2005). Defendants cite *Steelvest v. Scansteel*, 807 S.W.2d 476 (Ky. 1991) for the proposition that only officers or directors owe fiduciary duties. However, *Steelvest* merely stands for the rule that fiduciary duties can only be *presumed* in cases involving officers or directors. *Id*. at 485. When "mere employees" are involved, the existence of a fiduciary duty cannot be presumed. Instead, a fiduciary relationship is found only if the employer/employee relationship is one that is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily

8

for another's benefit in matters connected with such undertaking." *Id*.

This kind of determination is one that involves an inquiry into the specific circumstances of the employee's employment. *Miles Farm Supply, LLC v. Helena Chemical Company*, No. 4:06-CV-23-R, 2008 WL 3010064, at *7 (W.D. Ky. 2008). For example, the fact finder must determine whether the employee had "oversight and control over office operations and access to confidential information." *Id*. Other relevant inquiries are whether the employee was a manager and whether he "acted as a face for the company in public." *Id*. Aside from his title as assistant plant manager and lead extrusion machine operator, this Court is not aware of the details surrounding Naramore's employment. [R. 49, 55.] However, Naramore's title alone supports an argument that he owed FBK fiduciary duties, and because the movants did not address these "employment relationship" factors or argue that Naramore's relationship with FBK was not one "founded on trust or confidence," summary judgment on this claim will be denied.

The denial of Defendants' motion on this point is not to say that the Court is satisfied that Naramore's formulating plans to start a competitor company actually constituted breach of that duty. In fact, the Court is doubtful that it did constitute breach since Naramore was not bound by a non-compete. However, it is up to the movants in a summary judgment motion to present facts and arguments sufficient to support a finding that a reasonable jury could not find in favor of the non-movants. *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986). Because they did not even address the issue of breach, the Court cannot grant their motion.

**3.**

The Defendants also move for summary judgment on the conversion claim against Naramore. They argue that the conversion claim is preempted by KUTSA. Like the breach of

9

fiduciary duty claim, the conversion claim is only preempted to the extent it is based on

Naramore's alleged misappropriation of trade secrets. *T.D.I. International*, No. 6:07-313-DCR,

2008 WL 294531, at *6 (E.D. Ky. January 31, 2008) (dismissing a conversion claim because the

allegations did not give rise to a conversion claim apart from the use of trade secrets). FBK has

raised additional factual allegations to support its conversion claim, ones they allege are distinct

from the allegations that give rise to the misappropriation of trade secrets claim.

For example, FBK alleges that Naramore converted customer information and marketing

practices. [R. 87 at 4.] It also alleges that Naramore converted at least one request from a

customer for price information. [ *Id*.] According to FBK, on September 14, 2009, FBK's

customer, Hart Enterprises, Inc. sent a price request via fax to "Miller Medical Specialties/FBK."

[*Id*. at 19.] The fax was sent to the fax numbers for Miller "and FBK." [*Id*.] It also said

"Attention: Gary Miller/Hubert Thomas." [*Id*.] FBK alleges that Peerless employees took the

fax and fulfilled the request, thereby converting the price request intended for FBK, and making

it Peerless property. [*Id*.]

The Court need not decide if the customer request or "customer information and

marketing practices" referenced by FBK amount to trade secrets. In order for the conversion

claim to be preempted, Defendants would have had to demonstrate that those items *did* amount

to trade secrets. They did not do so. Furthermore, the Court need not decide whether or not

Plaintiff has met its burden of proof on the conversion claim. Defendants failed to argue that the

allegations asserted by FBK do not meet the elements for a conversion claim in Kentucky.

Instead they relied on their argument that the conversion claim is preempted. Therefore,

summary judgment on their behalf is not appropriate, and their motion on this claim will be

denied.

## 4.

Defendants next seek summary judgment on the breach of contract claim against Naramore. Once again, they argue that the claim is preempted by KUTSA. However, the statute explicitly states that contractual remedies are not preempted, whether or not the underlying claims are based on the misappropriation of trade secrets. K.R.S. 365.880. Therefore, even if the only factual basis for the claim were based on Naramore's receipt of the 2008 email, the breach of contract claim would not be preempted. It is not entirely clear from the Complaint the specific ways in which FBK alleges Naramore breached his contract. There is no need, however, for the Court to reach the issue of breach because Defendants only argue that there is no contract between Naramore and FBK. [R. 80-1.]

Naramore did not sign an Employment Agreement or a Non-Compete, but FBK argues that its "Employee Policies and Procedures" constituted a contract by which Naramore was bound. [R. 87.] In some cases, an employer's policies and procedures can be the basis of a contract if the employee continued to work for the employer after being given a copy of those policies. *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 362-63 (Ky. 2005) (citing *Toussaint v. Blue Cross & Blue Shield of Mich*., 292 N.W. 2d 880, 885 (Mich. 1980), *Southwest Gas Corporation v. Ahmad*, 668 P.2d 261 (Nev. 1983)). A contract will be found and will be enforced against an employer if the employee "had a legitimate expectation grounded in an employer's policy statements." *Id*. Most of the cases on this subject (and the ones cited by FBK) involve courts' enforcing policy statements against the employer– not against the employee. *Id*.

However, in *Kentucky Unemployment Insurance Commission v. Google*, 631 S.W.2d 28 (Ky. App. 1982), the court enforced the employer's policy statements (in a company handbook) against an employee. The court refused to grant an employee's request for pay during a plant shut-down, finding that the employee agreed not to be compensated during the plant shut-down by continuing to work for the company after receiving copies of the handbook that stated that certain employees would not be paid during the shut-down. *Id.* According to this case, courts have found that employers' policies constitute enforceable contracts, and have even enforced those "contracts" to an employee's detriment.

While the cases in this arena largely deal with payment and length of employment, this Court finds that the rationale of enforcing these policies as contracts applies in this case. Here, there is no argument that Naramore did not receive the employment manual. Instead, by continuing to work for FBK after receiving its policies and procedures, he agreed to be bound by its terms. There is no reason not to enforce that agreement. Again, this is not to say that Naramore actually violated the policies and procedures of the company, but Defendants failed to reach the issue of breach. The moving party bears the initial burden of identifying both the basis for its motions and the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). Because Defendants did not argue breach, it would be inappropriate to grant summary judgment in their favor.

**5.**

Next Defendants move for summary judgment on the intentional interference with contractual relationships claims brought against Murray and Peerless. This Court granted FBK's motion for summary judgment on the intentional interference with the FBK-Thomas contract in a

previous order.  [R. 117.]  FBK also asserted an intentional interference claim against Murray and Peerless for alleged interference with the FBK-Naramore contract.[4]  Defendants defend against this claim by arguing that no contract existed between Naramore and FBK.  [R. 80-1.]  For the reasons stated above, that argument fails.  Defendants also argue that, even if there is an enforceable contract, there is no evidence of breach.  [*Id.*]

In its Response to Defendants' motion [R. 87], FBK alleges that Naramore breached the "Conflict of Interests" portion of the policies and procedures.  That portion provided, "Employees shall avoid outside employment, activities, investments, and other interests that involve obligations which may compete with or be in conflict with the interests of the Company."  [*Id.*]  Clearly, this policy was in effect for the duration of Naramore's employment with FBK, but would not have extended into post-employment because there was no non-compete contract in place.  Therefore, Naramore's working for Peerless after leaving FBK was not a violation of the policies and procedures.  However, FBK argues that Naramore breached the policies and procedures by planning the formation of Peerless while still employed with FBK.  Even if this did amount to a breach, there is no evidence that Murray induced this alleged breach. Murray simply suggested that he and Naramore start a medical tubing company once Naramore left FBK– something Naramore was already planning on doing and was free to do since he was not bound by a non-compete.

_____

[4] Since Naramore was an at-will employee with no non-compete, any contract that was formed between he and FBK was only in force while he was employed at FBK.  Because Peerless was not formed until three months after Naramore left FBK, Peerless cannot have tortiously interfered with the Naramore-FBK contract.  The only relevant question is whether a reasonable jury could find that Murray intentionally interfered with the contractual relationship between FBK and Naramore

FBK's policies and procedures also prohibited Naramore from "receiving...proprietary data, trade secrets, or other confidential information" via the internet. Naramore could possibly have breached FBK's policies and procedures by receiving the email containing FBK data from Thomas. However, for purposes of the tortious interference claim, FBK presented no evidence that Murray somehow induced Naramore to violate the policies and procedures by soliciting the information via the internet from Thomas or otherwise violating FBK's policies and procedures relating to confidentiality. While it *plausible* that Murray encouraged Naramore to "steal" FBK data to facilitate establishing Peerless, there is no evidence in the record to indicate that he did. While FBK *may* be able to prove that Naramore breached a contract, the evidence at this point simply does not support the allegation that Murray induced any alleged breach.

To support a claim of tortious interference with a contractual relationship, the plaintiff must prove: 1) the existence of a contract, 2) the defendant's knowledge of the contract, 3) intent to cause the breach, 4) the defendant's conduct caused the breach, 5) damages, and 6) lack of privilege or justification to excuse the conduct. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995). FBK has not put forth any evidence to suggest that Murray knew about these policies and procedures– an element necessary to the tortious interference claim. FBK asserts that Murray was aware that Naramore was employed with FBK, but this is not the same thing as knowing about the "contract" (i.e. the policies and procedures). Neither has FBK put forth any evidence on the "intent to induce" or the causation element. In fact, the only evidence it points to is Naramore's deposition testimony that, while he was still employed with FBK, he and Murray discussed forming a competitor medical tubing company. [R. 87.] This one piece of evidence does not support a finding that Murray interfered with "a known

14

contractual relationship" and that the interference was "malicious or without justification" or "accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest*, 807 S.W.2d at 487. For these reasons, this Court finds that no reasonable jury could find that Murray intentionally interfered with a contractual relationship between FBK and Naramore, and the Defendant's motion on this claim will be granted.

## 6.

FBK has asserted a claim against all of the defendants for intentionally interfering with the contractual relationship between Gary Miller, for Miller Medical Specialties, and FBK. Miller, FBK's outside sales representative, had agreed not to compete with FBK until one year after termination of his employment. FBK alleges the non-compete was in effect until the spring or summer of 2010, while Miller states that his non-compete ended in June of 2009. [R. 81-1, Miller Depo., p. 77.] In October of 2008, Naramore contacted Miller to discuss Miller's coming on board with Peerless. [Naramore Depo., pp. 101-102.] One month later, Naramore and Murray met with Miller to further discuss his becoming a sales representative for Peerless. [*Id.*] Neither party disputes that Miller was still bound by his non-compete during those meetings and that Murray and Naramore were aware of the non-compete. [Murray Depo., pp. 30-32.] In June of 2009, Peerless hired Miller to serve as its outside sales representative, and he has since been soliciting clients on behalf of Peerless. [Murray Depo., pp. 30-32, Miller Depo., p. 63.]

Defendants claim they are entitled to summary judgment because FBK failed to meet its burden on the "intent to cause the breach" element. [*Id.*] The sole evidence they use as support for this argument is the fact that "Murray presumed actions taken by MMS in representing Peerless products were done freely by MMS" and that "Naramore made it clear that after he

15

initially contacted Gary Miller, it was Miller's obligation to deal with any obligations he might owe to FBK." [*Id.* At 10.]   However, turning a blind eye to the fact that Miller had an existing non-compete with FBK is not a defense. [*See* R. 117 (holding that telling Thomas to "deal with" his non-compete was no defense to the tortious interference claim).]

Next, Defendants argue that even if FBK has proven that the Defendants intended to induce Miller to breach his contract, it has failed to prove the damages element.   This Court is not convinced.   FBK has put forth enough evidence on the issue of damages to present a genuine issue of material fact.   Murray admits that Peerless has pursued FBK's customers since it began operating.  [Murray Depo., pp. 68-69.]   Seven out of ten customers to which Peerless sold products in 2009 were FBK customers.  [R. 81-1 Ex. D.]   Sales to one of FBK's major customers, BioMedix, plummeted by approximately $70,000 between 2008 and 2009.   Peerless's sales to BioMedix in 2009 grew by that same amount.  [R. 81-1.]   Significantly, according to FBK,  Miller was the one who solicited BioMedix on behalf of Peerless.  [R. 87 at 17.]   Miller also arguably used FBK's goodwill when he advertised the fact that some of Peerless's employees used to work for FBK.  [*Id.*]   These uncontested allegations are enough to demonstrate (at least) a genuine issue of material fact as to whether any interference with the Miller-FBK contract caused FBK damages.

This is not a finding that the remaining elements of a tortious interference claim have been satisfied.   In fact, because the parties disagree about when Miller's non-compete ended, there is a factual dispute as to whether he breached his agreement with FBK.   The Court simply finds that the Defendants did not put forth a sufficient basis on which to grant summary judgment, having only argued the "induce" and "damages" elements.   Having addressed

Defendants' only two arguments for summary judgment on this claim and found both lacking, the Court will deny summary judgment on the intentional interference with the Miller-FBK contract claim.

## 7.

Finally, Defendants challenge FBK's claim for unjust enrichment by arguing that unjust enrichment is only available when there is some sort of relationship between the parties– Here, FBK and Peerless. [R. 80 ("Unjust enrichment is a claim properly brought in a breach of contract action where an express contract does not exist but must be implied in fact. It is unclear what relationship existed between Peerless and FBK which might give rise to an actionable claim.")] Defendants misinterpret the use of unjust enrichment. A claim for unjust enrichment may be appropriate even where there is no contract implied in fact. *See Benefit Options Agency Inc. v. Med. Mut. Of Ohio*, No. 94245, 2010 WL 3722544, at *4 ("unjust enrichment will not lie when the subject matter of the claim is covered by an express *or implied in fact* contract") (emphasis added). The real issue is whether the specific facts give rise to an unjust enrichment claim. A claim for unjust enrichment is appropriate when 1) the plaintiff conferred a benefit on the defendant, 2) the defendant knew about that benefit, and 3) it would be unjust to allow the defendant to retain that benefit without payment. *Andersons, Inc. v. Consol*, 348 F.3d 496, 501 (6th Cir. 2003).

Unjust enrichment claims are routinely brought in cases involving some of the same elements present here (misappropriation of trade secrets, tortious interference with a contractual relationship, some type of unfair competition, etc.). *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010), *Atco Mfg. Co. v. Share Corp*., No. 3:07-CV-028, 2007 WL

1521008 (E.D. Tenn. May 22, 2007), *Hauck Mfg. Co. v. Astec Industries, Inc.*, 376 F. Supp.2d

808 (E.D. Tenn. 2005). Therefore, Defendants cannot rely on their conclusory statement that an

unjust enrichment claim is not appropriate under the facts of this case. Of course, to the extent

that the unjust enrichment claim is based solely on the facts giving rise to the misappropriation

of trade secrets claim, it is preempted by KUTSA. *Digital Envoy, Inc. v. Google, Inc.*, 370 F.

Supp. 2d 1025, 1035. Because Defendants failed to assert any real basis for dismissing the

claim, and because the evidence and inferences at this stage must be viewed in the light most

favorable to the nonmoving party, summary judgment on this claim will be denied. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

In light of the Court's Order here and in R. 117, the following summary describes the

issues remaining for trial. The Court granted summary judgment on FBK's claim against

Thomas for breaching the non-compete and issued a permanent injunction, prohibiting him from

continuing to work for Peerless. [R. 117.] That claim has been adjudicated and no issues

remain.

At the time the Order was issued, there were still other pending claims against Thomas

on which damages were sought. [R. 49.] However, the parties have since agreed that, in light of

the Court's finding that the Employment Agreement is valid and enforceable, the arbitration

provision in the Agreement controls, and thus Thomas is not subject to damages claims in this

Court. Thus, Thomas remains in this case only by virtue of a pending counter-claim against

FBK.

Thomas has actually asserted several counter-claims against FBK. [R. 9.] To the extent

18

the relief sought in those claims is damages, the arbitration provision controls, and those claims do not remain for trial.  In one of his counterclaims, however, Thomas seeks injunctive relief against FBK to prevent it from "making false and defamatory statements about [the] Defendant." [*Id.*]  Because he does not seek damages on that claim, the claim is not governed by the arbitration provision and is properly pending before this Court.

The Court granted summary judgment on FBK's tortious interference claim against Peerless for inducing Thomas to breach his non-compete.  Thus, liability on that claim has been decided.  The Court entered an injunction against Peerless, prohibiting it from employing Thomas for two years from the date of entry of the Order.  [R. 117.]  The Court held that an injunction was proper because in cases of a breach of a non-compete, damages are often "difficult or impossible to compute." [*Id.*]  This is not to say, however,  that all damages having some connection to the violation of the non-compete are impossible to compute.  At times, courts do award both injunctive relief and damages in claims for breach of a non-compete.  *See Singh v. Batta Envinronmental Associates, Inc.*, No. Civ. A. 19627, 2003 WL 21309115 (Del. Ch. May 21, 2003).

One of the prerequisites for entering an injunction is a finding that damages are an inadequate remedy.  The *Singh* court agreed that damages stemming from a violation of a non-compete are typically hard to compute when it held:

> Singh developed a personal relationship with certain Batta clients while employed at that firm, and the clients that he diverted from Batta have not done business with Batta since that time. How many new projects from those clients, and how many new clients Batta might have obtained had Singh not illegally competed, is unknown and possibly unknowable. That makes it impossible to calculate with any certainty the full extent of the damage that will be inflicted on Batta if Singh is allowed to continue violating the noncompetition provision.

*Singh*, 2003 WL 21309115, at *9. The court also recognized that a finding that damages stemming directly from the breach itself are difficult to compute does not mean that other damages related to the breach are unavailable. After finding that an injunction was appropriate, the *Singh* court went on to award damages against the breaching employee. *Id.* at 10. The court awarded him the monetary value of the projects he diverted before leaving the company and the projects that he performed in violation of the non-compete, after leaving the company. *Id.*

This Court applied Delaware law in its Order granting partial summary judgment to FBK because Delaware law governs the contractual non-compete provision between Thomas and FBK. At the pre-trial conference held November 29, 2010, Defendants objected to the use of Delaware law against them in the tortious interference claim. Aside from the use of one quote from a Delaware case that the Court found persuasive, this Court did use Sixth Circuit law to find that Defendants tortiously interfered with the FBK-Thomas contract. [*See* R. 117 at 13, 15.] The Court used Delaware law in discussing the appropriateness of an injunction as a remedy for breach of a non-compete because all aspects of the non-compete were to be governed by Delaware law, including the remedy.

To the extent the Defendants believe the outcome would have been different under Sixth Circuit law, and thus would affect the Court's decision about whether both damages and an injunction are available for a breach of a non-compete clause (and tortious interference inducing that breach), they are mistaken. Courts in the Sixth Circuit have also awarded both damages and injunctions for non-compete breaches. *See Mike McGarry & Sons, Inc. v. Gross*, No. 86603, 2006 WL 895094 (Ohio App. April 6, 2006), *Genesis Medical Imaging, Inc. v. DeMars*, No. 07-

360-KSF, 2008 WL 4180263, at *9-10 (E.D. Ky. September 5, 2008) (granting a permanent injunction via summary judgment after finding that damages flowing from the loss of fair competition and goodwill as a result of the breach were not susceptible to monetary value but reserving for trial the issue of the amount damages for lost profits and punitive damages.) This Court finds that the rationale for allowing damages and an injunction for breach of a non-compete also applies to the tortious interference claim that induced the breach of the non-compete. Therefore, while damages are not available against Thomas because of the arbitration clause, it cannot be said that FBK is not entitled to seek damages against *Peerless* for its tortious interference with Thomas's contract with FBK. While liability has been determined on that claim, the issue of damages still remains for trial.

In light of the Court's ruling on the dispositive motions, the issues of both liability and damages remain for trial on the following claims against Murray, Naramore, and/or Peerless: 1) violation of the trade secrets act, 2) breach of fiduciary duty, 3) conversion, 4) breach of contract, 5) intentional interference with the contractual relationship between FBK and MMS, and 6) unjust enrichment. As noted above, the issue of damages on the intentional interference with the FBK-Thomas contract claim still remains for trial. Finally, the issues of both liability and damages still remain on Thomas's defamation counter-claim.

## IV.

For the reasons stated above, and the Court being sufficiently advised, it is hereby

**ORDERED** that Naramore, Murray, and Peerless's Motion for Summary Judgment [R. 80] is

**DENIED IN PART AND GRANTED IN PART** in accordance with this Memorandum

Opinion.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge